United States Court of Appeals for the 11th Circuit. Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this Honorable Court. Good morning. This is Judge Wilson in Tampa, Judge Lagoa is in Miami, and Judge Brasher is in oral argument this morning. I would advise counsel that we have read the briefs and we have also examined the relevant parts of the record. If that will assist you in narrowing the focus of your arguments for the time that you have available this morning. Miss Tisa is the courtroom deputy and she will serve as the timekeeper and she will give you a two minute warning when your time to argue is about to expire and she will let you know when your time to argue has expired. So it looks like we are ready to proceed with the first argument. This is Ademola Adebayo versus the United States of America. Rachel Reese is here for Adebayo. Sophia Vickery is here for the United States and this race. You may begin morning runner. Thank you. May it please the court counsel. As your honor said, my name is Rachel Reese and I represent the appellant in this matter. Mr Adebayo. There were three issues raised in the briefs in this matter, but I would like to focus my time today on the issue concerning the lack of evidence that was presented at trial by the United States of America. Mr Adebayo was a pharmacist who had been licensed in the state of Florida for over 20 years without a single issue. At the time that this out the allegations came forward, Mr Adebayo was a pharmacist working at a pharmacy called A to Z Pharmacy, running the front of the house retail aspect of that pharmacy. Individuals that he worked with and that worked around him were ultimately indicted in the Middle District of Florida in a $150 million health care fraud conspiracy. Approximately two years afterwards, Mr Adebayo was similarly charged in the Southern District of Florida. Now it's our position that the evidence presented against him at trial by the government was not sufficient to prove beyond a reasonable doubt that he was involved in any of the fraudulent health care transactions or the underlying conspiracy to commit those transactions. He doesn't think that a he didn't do anything to participate in the conspiracy. Is that right? Absolutely, your honor. And we again, like your honor said, there is no dispute that there was absolutely a conspiracy going on. The witness testimony. There are quite a few witnesses who testified. In addition, um, multiple exhibits that were offered in the evidence. I have a question about exhibit 3 21. This is the bill of sale for the Havana Pharmacy, which was a front pharmacy. Is that correct? That is correct, your honor. That is what the evidence revealed was that it was a front pharmacy that was essentially I don't want to say created. Obviously, it was already it was already created at the point, but it was it became involved in this when the A to Z pharmacy began to be audited and other billing corporations no longer wanted to work with them. Um, sale exhibit 3 21. Where did the evidence establish that it was found? The evidence for that? I don't recall exactly where that piece of evidence was found. The issue I believe with 3 21 was the fact that it was actually signed or allegedly signed by Mr Adebayo. Um, and I think that was one of the issues that was raised with the fact was the fact that he was a person that actually signed this, and as a result, he had knowledge of this underlying conspiracy because he was essentially the that's why I asked the didn't agent Donovan testified that the exhibit the bill of sale for the for the Havana pharmacy, which was a front pharmacy was found near Mr Adebayo's workplace. I believe it was your honor. However, it was also testified that these documents were when they were found were no specific order. There was. It wasn't necessarily that Mr Adebayo was close by. There were several individuals that also had access to the general space. So there's just the fact that this proximity to where Mr Adebayo was working is our position that that's not enough to establish that he is the person that necessarily but the objection was not based on the authenticity of the document. It was just based on the claim that there's no proof that he signed it. And if that's the case, my question is, why couldn't the jury infer that he signed the document that was found near his workplace? And isn't that a question for the jury? Why couldn't the jury infer that he signed it? It was signed near his workplace number one and number two. The objection actually went to the weight of this evidence rather than to its admissibility. Is that right? Yes and no, Your Honor. Respectfully, the although the jury could obviously infer from the signature on it that it was Mr Adebayo that signed it and then obviously had possession of it by being found close to where he was working. The other inference, obviously, is that it could have been placed there by someone else. The other people who had access to this and several one of the witnesses. That's an argument that can be made to the jury, right? And then the jury can accept that argument or disregard it. Absolutely, Your Honor. However, that one piece of evidence is not enough to establish beyond a reasonable doubt that Mr Adebayo was involved with this and Mr Greg. But didn't also, uh, the district court judge ruled that on cross examination, defense counsel could challenge the authenticity of the signature. Absolutely, Your Honor. And council did. And it was established through Joseph D Gregorio that he actually had signed Mr Adebayo's name on several forms, and it was argued by council that this is one of those forms that actually didn't bear Mr Adebayo signature. And if your honors, you know, I just a lay person, not as an expert in any sort of the as the word. But to compare government exhibit 3 21 to government exhibit 3 26, which again 3 21 is the bill of sale. 3 26 is the express scripts provider agreement, which were both used together by the government to argue that Mr Adebayo obviously was involved in this conspiracy and had some sort of knowledge and joined it. The signatures on the two documents, which are both argued by the government to be written by Mr Adebayo, are completely different. The signatures are not the same. The handwriting is not the same. So just from a lay person's perspective, it's our position that those documents when considered together because we're not, you know, we're not looking at these things independently together, along with the other evidence that is not enough to beyond a reasonable doubt that Mr Adebayo was involved with this conspiracy or had any knowledge of its existence of anything. Unfortunately, he was the pharmacist that was acting legally performing his duties and then was used as a scapegoat for these individuals who are trying to get a lower sentence before we before we leave exhibit 3 21. Was there evidence? Is there evidence in this record that Borgesano paid Adebayo $50,000 from the same day that this, um, bill of sale was signed? And if there's any additional evidence that the jury could use to infer that Adebayo signed the document, they absolutely could, Your Honor. And there was an exhibit that was introduced by the government that summarized the financial contributions that Mr Adebayo received over several years. And again, it's our position that those again, Your Honor said, Can they infer that they can? However, that does not prove beyond a reasonable doubt that he was involved. If anything, he was not even ever. He was never paid more than $2 million by Mr Borgesano, who was essentially his boss. You know, he was also the leader of this conspiracy, but he was also the owner of these pharmacies. And as a result, he was the person who was paying Mr Adebayo for his job as a pharmacist. Over the span of several years, the government introduced a summary of the finances that were given to him, and they didn't even total a total $2 million in the grand scheme of how large this conspiracy lasted, and the amount of funds and amount of money that the other co conspirators made. Some, I believe that Mr Young testified that he made $7 million, $7.5 million. The doctor who only signed the prescriptions, Dr Williams, received half a million dollars. Um, so for someone that's actually actively working as a pharmacist performing duties on a daily basis again, Adebayo was a pharmacist, and I think this evidence reflects that he received $1.4 million for three years of work. That's a lot of money. If you're if you just work in the front, not the back, isn't it? Your Honor, I don't want to speculate. I don't know. I don't believe there's any evidence about how much a pharmacist normally would make per year. However, it's our position in the grand scheme. When considering the other evidence that that amount of money, when considering the fact that he's getting paid for a job to also infer that he was getting paid for inference from that would be that he would have been making a lot more than $1.4 million. And that's our position on that. Um, what about I understood that the government introduced some evidence that this activity was taking place in sort of open air, open site in the pharmacy in the back. And you know what they were doing is they were taking stuff out of one big bottle and distributing small bottles and whatnot. So it's like an assembly line activity. What do you say about about that evidence? Um, Your Honor, I think that the layout of the pharmacy is actually extremely important because, of course, we're not disputing the fact that the government can prove by the circumstances that someone in a specific position would understand or would have known about the conspiracy. But it's our position that the layout of the pharmacy, there were distinct boundaries between the front where Mr Adebayo was working full time in the retail portion in the back in the back. Um, as your honor said, there was testimony that there were people, there were billers, there were people that were actually putting together the compounds, things of that nature. The testimony from the witnesses was that Mr Adebayo really never spent much time back there. When he did, it was simply to come in, get any controlled substances that he needed to fill a prescription with from the locked safe, and then he would go back up to the front. The only other testimony otherwise of him being in the back was that if he ever were to have any meetings with Mr Borges on if he was ever present. So it's our position that there was never any testimony that Mr Adebayo was in the back of the pharmacy for a period of time that would have provided him with enough information to understand fully what was going on. If anything, it is the back of a pharmacy where a normal pharmacy. Arguably, there are people that are doing billing. There are people that are filling, you know, doing other things and again, sorting out these compounds. It's our position that Mr Adebayo that just seeing people doing that would not have been enough to establish that he knew this thing that the layout of the pharmacy is actually extremely important to that aspect of it. Would you mind addressing the special skill enhancement? Because I so I'm gonna ask the government this. You know, he obviously obviously your client has a special skill. He's a pharmacist, but it's unclear whether he used that special skill in committing the crime. Does that make sense? Absolutely. Your honor. And I think I think that's about that. I think that's a great point. And I would agree. I think that the fact that someone is simply a pharmacist, and I believe this is the argument that counsel made below is that simply because someone is a pharmacist doesn't automatically mean that they're entitled to this enhancement. That would be saying that if I as an attorney in the state of Florida committed a crime just because I'm an attorney, I'm not. I don't have a special skill that would provide for a two level enhancement. I would have to use my skills as an attorney or he would have to have had to have used skills as a pharmacist. Two minutes, please. Thank you. He would have had to have used his skills as a pharmacist to actually participate in this conspiracy. And as many of the witnesses testified, none of these people had the skills of a pharmacist, and they were just as equally capable of fulfilling these these acts that further the conspiracy as Mr Adebayo, arguably by the government's position, was doing. So it's our position that just because he was a pharmacist is not enough to give him the two level enhancement. And that's what that is what the district court found. They the district court literally stated the fact that because he was a pharmacist, that enhancement applied. So it's our position that assuming that our first argument about the sufficiency of the evidence is would fail. Is there evidence, Mrs Reese, that he changed prescription formulas so that they would be accepted by the insurers? Your Honor, it is. I apologize, Your Honor. And I apologize for interrupting your honor. It's our position that he was never asked to actually change the formulas. He was asked to fill new prescriptions after the formulas or the prescriptions were changed when they wouldn't go through. So the testimony from Mr Stirner was that he was when someone would call about a billing issue, the actual drug formula would be changed. And once that was changed, then that would actually be given to out of bio and then he would fill the prescription. So it's our position that that testimony is just establishing that he was doing his job. There's no testimony that he was involved in the actual change of the formula or the change of the prescription. The testimony was simply that he was actually the one fulfilling that prescription once it was changed. So our position is that his job as a pharmacy as a pharmacist was never actually used to further the conspiracy. And I see my time is about to expire. Um, I thank you. All right. Thank you. Miss race. We'll now hear from the government. Miss Vickery. Thank you, Your Honor. May I please support Sophia Vickery for the United States. With respect to the sufficiency of the evidence argument, there are four categories of evidence that I wanted to highlight. And I thought I'd start first with the Havana Pharmacy discussion to pick up where you all would like leaving off with respect to exhibit 3 21. That's the bill of sale. I wanted to clarify that that exhibit was actually produced by subpoenas pursuant to a 902 C subpoena as a record from a pharmacy. I also wanted to clarify Mr Gregorio's testimony about the alleged forgery. His testimony was rather equivocal. He was talking about an entirely separate document said he couldn't remember if Mr Adebayo had signed it or he had signed it and he just didn't know who had signed it. There's plenty of his name, its signature on the bill of sale, but it was actually signed by the defendant, including the $50,000, which is uncontested. Excuse me that he received that same day. About three weeks later, he signed the agreement with Express Scripts, the pharmacy benefit manager again, pretending to be the owner of Havana Pharmacy. And there's no dispute that it's his signature on that document or that he was paid $62,000 the same day he signed that. There's also testimony from other witnesses describing the front pharmacy scheme in general. Um, for example, Mr Young testified that in Mr Adebayo's presence, he agreed to become the front pharmacy of Jamie Farm, the pretend owner of Jamie Pharmacy, another front pharmacy. And the same thing with Mr Gregorio for Prestige Pharmacy. Mr Adebayo was fully aware of what was happening when he received these payments and signed these documents. And in the month after he agreed to become the pretend owner of Havana Pharmacy, compound claims went from $0 to $1.3 million in one month's time. And remember, before his involvement in Havana Pharmacy, he was involved in the conspiracy of A to Z Pharmacy. The second category of evidence I wanted to discuss was his involvement in choosing the ingredients for the fraudulent insurance claims. He chose those ingredients based on profit, not based on medical need. And when insurance stopped paying for specific ingredients, he changed them to make sure that insurance would accept them. Would you explain that? Would you just unpack that a little bit for me? What do you mean by chose the ingredients, change the ingredients? Sure. So there's testimony from other witnesses that the defendant would be in meetings with Borgasano and other participants in the conspiracy, and they would design these formulas for the templates. They were blank prescriptions with a few kind of like a menu of options. And the ingredients that they chose that the witnesses testified were based on what would pay the most from insurance, not based on what patients wanted or needed. And the defendant was fully aware that patients didn't want or need those drugs, because they told him. He was the person who was answering the phone when patient after patient called the pharmacy, saying, Why am I getting this drug? And who is Dr. Williams? I have never met him. He was also the person who sorted through the returns at his pharmacy. And the defendant, day after day, would take a bin of return creams, peel the labels off, see if it was visibly soiled, and if not, put it in a bin for the next day's batch. The third category of evidence I wanted to discuss was the overbilling scheme. Before you leave that, and so I mean, your your question goes to the to the skills. And is there evidence that he participated in audits of billing discrepancies as well? Yes, Your Honor. Okay, what was that? What was that evidence that said that he participated in audits of billing discrepancies? So not only did he participate in those audits, but he was actually the main point of contact for the insurance companies. There's testimony from Mr. Young and Mr. DiGregorio that the auditors were sent to the defendant to answer their questions. And he also handled the paperwork requests. So when they would request paperwork documenting specific prescriptions, he would assist in assembling that and sending it back. There's testimony, for example, from Ms. Chapin, who is an auditor from CVS describing a series of five or six phone calls, including an hour long one at the end where she went through discrepancy after discrepancy. All of the issues at A to Z Pharmacy with these prescription claims and the defendant, you know, pretended that he had no idea what was happening. And of course, he continued to participate in the scheme after that phone call, including at Havana Pharmacy. While we're on the sentencing enhancement, the other aspects of his conduct, which I think support that enhancement, are his, it's his role in choosing the formula for the compound creams, which he chose, again, based on profit. The fact that he would help the billers change the prescriptions. And there's evidence that it wasn't just filling a change. The billers would come to him and say, this prescription was rejected, and he would help them change the dosage, change the refill, change the quantity. All of these different aspects to try to submit, submit, submit, until it was accepted. Additionally, he was involved in the ethoxydiglycol over the pharmacy would bill for the wrong volume of that ingredient, which was much more expensive than the volume that they were actually using. May I ask you a question regarding the change in the prescription? What evidence, though, do you have that those changes were not done on behalf of the actual real patient or real client? So there were a couple of patients who testified at trial explaining that they had no idea why they got these medicines. There's also evidence, generally, that none of these medications were prescribed for medical need. They were all for profit. There's phone calls from patients, there's their returned drugs, and there's evidence from other witnesses explaining the scheme, generally, as well as the volume of returned products that patients rejected. Fifty percent of what was sent out actually just mailed it back, in addition to all of the people who called and all of the testimony about the fact that patients didn't need these drugs. There's also evidence that, for example, some of the prescriptions weren't even signed by a doctor, but the defendant was present when, in response to an audit, Dr. Williams came in and just signed a stack of blank prescriptions to fulfill a paperwork request, prescriptions that had already been filled and already mailed to patients, but that they needed to sign to send to the insurance company as documentation. Additionally, on the sentencing enhancement point, in these circumstances, it was not clear error for the district court to find that the defendant used his special skill as a pharmacist. So I believe the last category of evidence I wanted to mention was this ethoxydiglycol overbilling scheme, where the defendant was involved in ordering the cheap volume of that ingredient, but with bill insurance for the much more expensive quantity. There are a couple of witnesses who testified that he was fully aware of this problem. They told him about the problem. His name appears on these invoices, but yet he continued to participate in that scheme, and the price difference is pretty big. It's $61.35 as a discrepancy between the two volumes. In sum, the conspiracy resulted in $121 million of lost claims. The defendant received $1.4 million in personal profit from Borgesano, which includes the payments we discussed with respect to Havana Pharmacy and his role as a pharmacist there. If there are no further questions, I just ask the you have reserved some time for rebuttal. Yes, your honor. Thank you. Just a couple of points I wanted to address briefly. The first point in regards to Mr. Adebayo being the pharmacist that was changing the formulas and actively using his skill as a pharmacist to further this conspiracy, I think there's something that's important to remember, and that point kind of ignores the testimony from several of the witnesses that Mr. Adebayo was identified as a pharmacist that was acting in the front of this pharmacy, and the pharmacist that was acting in the back was actually Mr. Young, and that was testified to by Mr. Young himself. It was also testified by Mr. DiGregorio, testified that specifically Mr. Adebayo was in the front and Mr. Young was in the back, so I think that's an important distinction that the jury was also presented with, so it's not just Mr. Adebayo allegedly doing this. The testimony was actually that Mr. Young was the person in the back actively being the pharmacist in charge, so I think that that's important to note. The other point in regards to the sentencing enhancement is, again, other than Mr. Adebayo, every other person that was involved in this conspiracy did not have this alleged special skill, yet every other person was actively participating, and without that special skill, they were successfully completing their act, and they're part of this conspiracy and the underlying fraud, so it's our position that because those individuals were performing the exact same acts as Mr. Adebayo without the special skill, then he was not using this special skill as a pharmacist to further the conspiracy or the underlying substantive acts, so that should not have been an enhancement that applied to him just because of the fact that he's a pharmacist, and it is our request that this court either find that the Mr. Adebayo's judgment in sentence or vacate his sentence and remand his case accordingly so he can be resentenced under appropriate guidelines. I thank the court for your time. All right, thank you, Ms. Reese and Ms. Vickery. That concludes this argument. Thanks.